**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Convergys Corporation,  )
<u>et al.</u>,                        )
                             )
              Plaintiffs,    ) Case No. 1:07-CV-509
                             )
       vs.                   )
                             )
Michael P. Wellman,          )
<u>et al.</u>,                        )
                             )
                             )
              Defendants.    )

<u>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER</u>

        On June 29, 2007, Plaintiffs Convergys Corporation and Convergys Customer Management Group, Inc. filed a verified complaint against Defendants Michael P. Wellman, Jr. and Sitel Corporation for a temporary restraining order and a preliminary injunction.  The complaint seeks enforcement of a non-compete agreement between Plaintiffs and Defendant Wellman and to enjoin Wellman from employment with Defendant Sitel Corporation for a period of two years.  On July 30, 2007, the Court entered a temporary restraining order (Doc. No. 7) which, in general terms, prohibited Wellman from soliciting Plaintiffs' customers and employees, and from disclosing Plaintiffs' trade secrets, but otherwise did not prohibit Wellman from working for Sitel Corporation.  The matter then came before the Court on August 23, 2007, August 24, 2007, and September 27, 2007 for an evidentiary hearing on Plaintiffs' motion for a preliminary injunction (Doc.

1

No. 6).  The parties submitted post-hearing briefs on October 5, 2007 (Doc. Nos. 19 & 20).

The Court, having considered the pleadings filed by the parties, the evidence presented at the hearing, and the post-hearing briefs of counsel, hereby enters the following Findings of Fact, Conclusions of Law, and Order.  To the extent that the foregoing findings of fact should more properly be considered conclusions of law, and vice versa, they are hereby adopted as such.

## I. <u>Findings of Fact</u>

1. Plaintiffs Convergys Corporation ("Convergys Corp.") and Convergys Customer Management Group, Inc. ("Convergys-CMG") are Ohio corporations with their principal places of business located in Cincinnati, Ohio.  Amended Complaint (Doc. No. 28) ¶ 3; Wellman Amended Answer (Doc. No. 29) ¶ 3; Sitel Amended Answer (Doc. No. 30) ¶ 3.

2. Defendant Michael P. Wellman is a citizen of the state of Florida.  Amended Complaint ¶ 4; Wellman Answer ¶ 4.

3. Defendant Sitel Corporation is a Minnesota Corporation with its principal place of business in Tennessee.  Amended Complaint ¶ 5; Sitel Amended Answer ¶ 5.

4. Defendant Sitel Operating Corporation is a Delaware corporation with its principal place of business in Tennessee. Amended Complaint ¶ 5; Sitel Amended Answer ¶ 5.

5. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy is in excess of $75,000. Findings of Fact 1-4; Amended Complaint ¶ 6.

6. According to the Amended Complaint:

> Plaintiff Convergys Corp. provides outsourced integrated billing, employee and customer care software and services around the world.  Convergys Corp. focuses on developing long-term strategic relationships with clients in employee- and customer-intensive industries, including technology, telecommunications, cable, broadband, direct satellite broadcasting, Internet services, financial services and government.
>
> . . .
>
> Convergys Corp. serves its customers through two wholly-owned subsidiaries, one of which is Plaintiff Convergys-CMG.  Convergys-CMG provides outsourced marketing, customer support services and employee care services to Convergys clients around the world.

Amended Complaint ¶¶ 2, 3.  Stated more plainly, Convergys Corp. and Convergys-CMG staff call centers with their own employees who then perform customer service functions for other companies.  Tr. at 144; 172.

7. Sitel Corporation is in the business of providing customer care and back office processing services for its clients, essentially the same business as Plaintiffs.  Amended Complaint ¶ 5; Sitel Answer ¶ 5.  Plaintiffs and Sitel Corporation are in fact direct competitors.  Tr. (Doc. No. 14) at 174-75; Tr. (Doc. No. 15) at 380; Tr. (Doc. No. 18) at 644-45.

8. Convergys Corp. hired Defendant Wellman as Regional Director of Human Resources in September 1999.  Tr. at 244.  Prior to beginning employment with Convergys Corp., from 1997 to 1999, Wellman was Director of Human Resources/Employee Relations for Planet Hollywood International, Inc. in Orlando, Florida. Plaint. Ex. 1; Tr. at 237.  As Director of Human Resources for Planet Hollywood, Wellman was responsible for the development and implementation of human resources policies and programs, recruiting and retention of employees, employee benefits design and administration, and employee training and professional development for 2,000 employees.  Plaint. Ex. 28.  Prior to his employment with Planet Hollywood, Wellman worked for Hyatt Hotels & Resorts from 1988 to 1997.  Id.  Wellman's last position with Hyatt was Assistant Director of Human Resources.  Id.  In this position, Wellman managed an eight-person staff and was responsible for the human resources activities for approximately 1,200 employees.  Neither Planet Hollywood nor Hyatt were in the business of providing outsourced customer care services.  Tr. at 237-38.

9.  Convergys hired Wellman as Regional Director of Human Resources in 1999.  Tr. at 244. In 2003, Wellman was promoted to Senior Director of Human Resources.  Id. at 245.  In 2006, Wellman was promoted to Vice President of Global Human Resources Operations.  Id. at 251; Plaint. Ex. 28.  Wellman's general

responsibilities are accurately described by his 2004 self-
appraisal - reducing attrition, improving recruiting, training
and development of employees, managing costs and revenue for the
human resources department, and improving delivery of human
resources services.  Tr. at 585-88.  However, in his various
positions, Wellman did not have any responsibilities for sales to
or contact with Convergys's customers.  Id. at 165.  Convergys
did not provide Wellman with any formal training in any human
resources function at any time during his tenure with Convergys.
Id. at 110, 341-42.  Rather, in performing his human resources
function with Convergys, Wellman principally applied the skill
and experience he acquired working for his previous employers.
Id.

10.  During his employment with Convergys, Wellman signed a
series of non-competition and non-disclosure agreements.  See
Plaint. Exs. 2-4.  Additionally, Wellman acknowledged the non-
competition and non-disclosure agreements online by accepting
annual restricted stock awards.  Tr. at 253-56; Plaint. Ex. 6.
The non-competition and non-disclosure agreements Wellman signed
provide in pertinent part:

> 3. During employee's employment by the Company and for
> a period of two years following termination of
> employee's employment with the Company for any reason,
> Employee will not engage in any business (whether as a
> principal, partner, joint venturer, agent, employee,
> salesperson, consultant, director or officer) offering
> services related to the Company's then existing
> business or the products or services being researched

by the Company about which Employee has or had any Information, where such position would involve Employee:

> (i) in any business activity in competition with the Company, including but not limited to businesses that provide:
>
> > a) billing and/or billing related services and/or services to third parties (including but not limited to wireless, wireline, cable, and other communications businesses;
> >
> > b) outsourced customer management services (including but not limited to product information or technical support, customer retention sales and/or account management; or
> >
> > c) outsourced employee care services (including but not limited to the administration of health and welfare, defined benefit, defined contribution, payroll, learning, recruiting and staffing services; or
>
> (ii) in any position with any Customer of the Company where such position relates to the services that the Company does or did provide to such customer.

This restriction is limited to the geographical area where the Company is doing business at the time of termination of Employee's employment.

4. During Employee's employment by Company and for a period of two years following termination of Employee's employment with the Company for any reason, Employee will not (except on behalf of the Company or as a private consumer) in any manner related to the Company's then existing business or products or services being researched or developed of which Employee has or had any Information, directly or indirectly, through any person or entity, divert, call on, contact, communicate or solicit:

> (i) any of the Company's customers from which the Company generated revenue during the two years

> preceding the termination of Employee's
> employment; or
>
> (ii) any prospective customers known to Employee
> during the two-year period prior to the
> termination of Employee's employment.

Plaint. Ex. 4, at 1-2. Furthermore, according to the agreement,

the term "Information" includes:

> the organization and management strategies of the
> Company; the names, addresses, buying habits and other
> special information regarding past, present, and
> potential customers, employees, and suppliers of the
> Company; employee lists; customer relationships;
> customer and supplier contracts and transactions;
> pricing; pricing lists of the Company and suppliers;
> products, services, programs and processes sold,
> licensed and developed by the Company; technical data,
> plans and specifications relating to present and/or
> future development projects of the Company; financial
> and/or marketing data regarding the conduct of the
> present or future phases of business of the Company;
> computer programs, systems and/or software; ideas,
> inventions, trademarks, trade secrets, business
> information, know-how, processes, improvements,
> designs, redesigns, discoveries and developments of the
> Company; and other information considered confidential
> by the Company or customers or suppliers of the
> Company.

Id. at 1. The agreement has an Ohio choice of law clause. Id.

at 4.

11. One of the key challenges in running a successful call center

business is recruiting and retaining agents - the entry level

employees who staff the customer service lines. Tr. at 36-37.

Accordingly, reducing attrition is a primary goal of any call

center business, including Convergys. Id. at 36-37; 40.

12.  In order to combat attrition, Convergys implemented several programs or initiatives.  One of these initiatives was entitled "Agent Career Path."  The Agent Career Path established a three-tier progression for advancement from an entry-level agent position.  Tr. at 91-96.  As part of this program, agents are advised of the performance criteria needed to be achieved to advance to the next tier as well as the benefits to be gained from advancement.  Id.  The purpose of the Agent Career Path program is to assure the agent that he or she has an opportunity to grow and develop with Convergys with the hope of then retaining the agent.  Id. at 145.  Wellman led the group that developed the Agent Career Path for Convergys.  Id. at 180; 281-82.  Career path modeling, however, is not a one-size-fits-all solution.  In other words, one company's career path model may not work for another company.  Tr. at 574-75.  Sitel in fact has had in place for several years its own version of the Agent Career Path program.  Id. at 640-41; 671-72.

13. Another program devised by Convergys is called "Team Leader Transformation."  Tr. at 145.  At Convergys, team leaders supervise agents.  Id. at 161-62.  The purpose of the Team Leader Transformation program is to redefine the team leader position to make it more supportive of the agent position as well as develop a career path for team leaders.  Id. at 148.  The main thrust of this program is to lessen the administrative burden on the team

8

leaders so that they can devote more time to the agents they supervise. Id. at 162. This is accomplished by using technology to reduce the paperwork team leaders must handle. Id. Wellman was Convergys' human resources representative to the Team Leader Transformation program. Id. at 189-90.

14. The Early Warning System was first developed by a Convergys subsidiary in India. The Early Warning System identifies signs of employee dissatisfaction coupled with a scoring system to assess when a employee is at risk of leaving the company. When the agent's score reaches a critical point in the scoring system, the team leader intervenes to counsel the agent and, hopefully, discover why the agent's performance and/or satisfaction is declining in order to retain the agent. Tr. at 183-84. Tr. at 183-84. Convergys uses a green, yellow, red system to determine when an agent is at risk. Id. Details of the Early Warning System were published in the Chattanooga Times Press in August 2007 and on a news website based in the United Kingdom in April 2007. Id. at 224; Def. Ex. 202 & 203. Although the human resources division supported the Early Warning System, this program was operated principally at the operations level. Tr. at 271-73. Sitel has in place its own version of the Early Warning System called the "Red Zone System." Id. at 640.

15. Another measure Convergys adopted to improve retention and lower costs is the Home Agent Program. As the name implies, this

program allows agents to work from home.  Tr. at 182.  A number

of companies besides Convergys provide a work-at-home option for

their employees.  Id. at 185; 209; 218.  Convergys actually

cooperates with one its competitors on the Home Agent Program.

Id.  Wellman did not have any primary responsibility for

Convergys's Home Agent Program.  Id. at 560.

16.  Another program at issue in this case is the Global

Recruiting Initiative, the goal of which is to improve

Convergys's recruiting practices and methods.  Tr. at 552.

Wellman was in charge of this program.  Id. at 279.  The purpose

of the Global Recruiting Initiative is to best position Convergys

in the marketplace to recruit employees.  Id. at 185-86.

Although the Global Recruiting Initiative is a strategic plan of

Convergys, the actual details and implementation of this plan

occur at the local level according to each site's particular

situation.  Id. at 186.

17. HR Direct is a product of Convergys to provide human

resources services, such as payroll and employee benefits, to its

customers.  Tr. at 163-64.  It is not clear on this record what

specific role Wellman played in providing this service although

the person who was responsible for the product reported to him.

Id. at 142-43.

18. Another process of Convergys in which Wellman participated

was site selection - assessing and determining the geographical

location for a physical building.  This process takes into consideration a number of factors, including the size and education of the local labor force.  Tr. at 108, 226, 305. Wellman was part of the Convergys site selection team and, although not the final decision-maker, had a role in the decision-making process.  Id. at 395, 510.  It appears, however, that third-party consultants did most of the actual number crunching and submitted site selection proposals to Convergys. Id. at 226, 271, 305-06, 308-09, 511-12; Plaint. Exs. 15-17.

19.  Wellman accepted a position with Sitel Corporation on or about June 20, 2007 to become Sitel's Chief Global Human Resources Officer and began working for Sitel on July 16, 2007. Amended Complaint ¶ 28; Wellman Answer ¶ 28; Tr. at 344, 364-65; 603; Plaint. Ex. 27.  In this position, Wellman is responsible for all facets of Sitel's human resources organization.  Tr. at 355-56.  However, Wellman's position with Sitel does not involve solicitation of customers or employees.  Id. at 603. Furthermore, and more specifically, Wellman has not solicited any of Convergys's customers or employees during his limited tenure with Sitel.  Id. at 604.  Additionally, Wellman has not shared with Sitel, nor has Sitel pressured Wellman to share with it, any information he has concerning Convergys's human resources programs and initiatives.  Id. at 604.  Wellman does not possess

any documents relating to Convergys's human resources
initiatives.  Id. at 605.

20. Convergys does business throughout the United States and
Canada, the Philippines, and India.  Convergys also has smaller
operations in the United Kingdom and Europe.  Tr. at 175.

## II. Standard of Review

        To determine whether to grant a preliminary injunction,
a district court must consider: (1) the plaintiff's likelihood of
success on the merits; (2) whether the plaintiff may suffer
irreparable harm absent the injunction; (3) whether granting the
injunction will cause substantial harm to others; and (4) the
impact of an injunction upon the public interest.  Deja Vu of
Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County,
274 F.3d 377, 400 (6th Cir. 2001).  "None of these factors,
standing alone, is a prerequisite to relief; rather, the court
should balance them."  Golden v. Kelsey-Hayes Co., 73 F.3d 648,
653 (6th Cir. 1996).  Thus, even though a finding of no
likelihood of success "is usually fatal[,]" Gonzales v. Nat'l Bd.
of Med. Exam'rs, 225 F.3d 620, 625 (6th Cir. 2000), a district
court should ordinarily analyze all of the factors.  Leary v.
Daeschner, 228 F.3d 729, 739 n.3 (6th Cir. 2000).  Under Ohio
law, which governs this case, the plaintiff must establish his
entitlement to preliminary injunctive relief by clear and
convincing evidence.  Blakeman's Valley Office Equip., Inc. v.

<u>Bierdeman</u>, 786 N.E.2d 914, 917 (Ohio Ct. App. 2003). "Clear and convincing proof" is between the criminal standard of "beyond a reasonable doubt" and the preponderance-of-the-evidence standard normally applied in civil cases: its nature is such that it will produce in the factfinder's mind a firm belief as to the allegations sought to be established. <u>Callen v. Internat'l. Bhd. of Teamsters, Local 100</u>, 761 N.E.2d 51, 59 (Ohio Ct. App. 2001).

III. <u>Analysis</u>

A. <u>Likelihood of Success on the Merits</u>

In Ohio, reasonable non-competition agreements are enforceable and those that are unreasonable are enforceable to the extent necessary to protect the employer's legitimate business interests. <u>Proctor & Gamble Co. v. Stoneham</u>, 747 N.E.2d 268, 270 (Ohio Ct. App. 2000). A covenant not to compete is reasonable if it is no greater than required for the protection of the employer, does not impose an undue hardship on the employee, and is not injurious to the public. <u>Id.</u> (quoting <u>Raimonde v. Van Vlerah</u>, 325 N.E.2d 544, 545 at syl. 2 (Ohio 1975)). In assessing whether a covenant not to compete is reasonable, the trial court should consider the following factors: whether the agreement contains time and space limitations, whether the employee is the sole contact with the customer, whether the employee has confidential information and trade secrets, whether the agreement seeks to limit only unfair

13

competition or is designed more broadly to eliminate ordinary competition, whether the agreement seeks to stifle the employee's inherent skill and experience, whether the benefit to the employer is disproportional to the detriment to the employee, whether the agreement bars the employee's sole means of support, whether the skills that the agreement seeks to restrain were actually developed during the employment, and whether the forbidden employment is merely incidental to the main employment. Id. at 270.

In this case, after hearing the evidence and reading the briefs of the parties, the Court is not left with a firm belief that the non-competition agreement Convergys seeks to enforce is reasonable under Ohio law.   In reaching this conclusion the Court finds the following:

**Time and Space Limitations**.  The non-competition agreement has reasonable time and space limitations given the nearly global scope of Convergys's operations.  Finding of Fact 20; see e.g. Myers v. Costello, No. CA-917, 1989 WL 76464, at *12 (Ohio Ct. App. June 26, 1989)(two year restriction reasonable); Superior Consulting Co., Inc. v. Walling, 851 F. Supp. 839, 847 (E.D.Mich. 1994)(non-competition agreement's unlimited geographic scope reasonable where employer did business in forty-three states and a number of foreign nations)(Michigan law).  This factor weighs in Convergys's favor.

14

**Sole Contact with Customer**.  Wellman had no customer contact responsibilities in his position with Convergys, nor does his new position with Sitel require him to solicit customers or employees.  Findings of Fact 9, 19.  This factor weighs in favor of Defendants.

**Confidential Information and Trade Secrets.**  The extent to which Wellman possessed confidential information and trade secrets of Convergys is the most significant issue in the case.  Certainly the evidence establishes that Wellman participated in and led strategic human resources programs for Convergys at the highest levels of its organization.  The Court, however, is not firmly convinced that all or any of the programs about which Convergys is concerned constitute confidential information or trade secrets and, to the extent they are, that they have much value for Sitel.

Sitel already has in place its own version of Convergys's Agent Career Path and Early Warning System.  Findings of Fact 12, 14.  Moreover, the general concept of the Early Warning System has been disclosed publically in newspapers and internet sites.  Finding of Fact 14.  Convergys's Agent Career Path model likely could not be adopted by Sitel as is.  Finding of Fact 12.  Thus, Wellman's knowledge of these programs would not seem to enhance Sitel's ability to compete with Convergys.

The record discloses nothing about Convergys's Home Agent Program which differentiates it from any other company's

15

tele-commuting program or which gives Convergys a competitive advantage.  Moreover, Convergys actually shares details of its Home Agent Program with another competitor.  Finding of Fact 15. In any event, Wellman did not have any primary responsibility for implementing this program for Convergys.  Id.  Thus, on this record, the Court can only conclude that Convergys's Home Agent Program is generic and that Wellman's knowledge of this programs is not injurious to Convergys.

Convergys's site-selection process seems largely farmed out to consultants to generate the relevant data and to provide the best recommendations.  Finding of Fact 18.  Although Wellman participated in this process and was obviously aware of locations in which Convergys was interested, he acquired no specialized knowledge of a secret site-selection process.

Convergys's Global Recruiting Initiative was so vaguely and generally described by witnesses that it is difficult to conclude that this program is anything other than a broad concept to enhance Convergys's attractiveness as a prospective employer. In any event, the details of and actual implementation of the Global Recruiting Initiative vary at the local level.  Finding of Fact 16.  Therefore, Wellman does not seem to possess information concerning the Global Recruiting initiative which can realistically be expected to be beneficial to Sitel or injure Convergys.

16

The Team Leader Transformation program has an impressive sounding name but really is nothing more than the time-honored and elusive quest to reduce the administrative burdens imposed by paperwork.  Finding of Fact 13.

In short, as Defendant Wellman's testimony suggests, despite the genuine efforts to preserve the confidentiality of its initiatives, Convergys has essentially just affixed its own monikers to a number of fundamental human resources concepts that it has implemented.  Although it is certainly important to Convergys that these concepts be implemented and executed properly, the Court cannot find on this record that these human resources initiatives constitute trade secrets or confidential information or that Wellman's knowledge of these initiatives is detrimental to Convergys.

The Court finds that this factor favors Defendants.

**Whether the Agreement Seeks to Limit Unfair Competition or More Broadly to Eliminate Ordinary Competition**.  In this case, the non-competition agreement, or at least Convergys's attempted enforcement of it, seems geared toward eliminating ordinary competition.  Clint Streit, the President of Convergys, testified that he would not be concerned if Wellman took his skills and knowledge of Convergys's plans and initiatives to lesser competitors of Convergys.  Tr. at 415-19.  Streit's testimony is a tacit but telling concession that Wellman's employment with

Sitel would not constitute unfair competition and that Convergys is simply interested in eliminating competition. Indeed, Streit does not view smaller players in the customer care service industry as bona fide threats to Convergys. See id. As Defendants astutely argue, Convergys is not truly concerned about disclosure of its human resources practices and strategies if Wellman's working for a smaller competitor is not objectionable to Convergys. Clearly then, Convergys is only interested in eliminating ordinary competition by enforcing this agreement. Thus, this factor favors Defendants as well. See, e.g., Moda Hair Designs, Inc. v. Dechert, No. 2005CA00192, 2006 WL 337373, at *3 (Ohio Ct. App. Feb. 13, 2006)(upholding trial court's decision not to enforce non-competition agreement where it was designed to eliminate employer's main source of competition); Westco Group, Inc. v. City Mattress, No. 12619, 1985 WL 144712, at *3 (Ohio Ct. App. Aug. 15, 1991) (non-competition agreements were not intended to prevent ordinary competition).

Additionally, the third element in Raimonde provides that a covenant restraining an employee from competing with his former employer upon termination of employment is reasonable and enforceable if it is not injurious to the public. The third element is primarily concerned with the public's interest in promoting fair business competition. Brentlinger Ent. v. Curran, 752 N.E.2d 994, 1004 (Ohio Ct. App. 2001). Here, enforcing the

18

non-competition would not promote fair business competition.
Rather, as explained, enforcing the agreement would restrict
ordinary competition. Accordingly, this factor favors Defendants
as well.

**Whether the Agreement Seeks to Stifle the Employee's Inherent
Skill and Experience/Whether the Benefit to the Employer is
Disproportionate to the Detriment to the Employee/Whether the
Agreement Bars the Employee's Sole Means of Support/Whether the
Skills the Agreement Seeks to Restrain Were Actually Developed
During the Employment.** The Court addresses these factors
together because, at least in this case, they are interrelated.
Enforcing the non-competition agreement would stifle Wellman's
inherent skill and experience. Although Wellman gained
experience working in a call center environment while working for
Convergys, Convergys did not provide Wellman with any special or
particularized human resources training for him to perform his
job. Rather, according to Wellman, he applied the skill and
experience he acquired over the course of his career as a human
resources executive in other organizations to perform his job at
Convergys. Although Wellman's talent as a human resources
executive was enhanced by his employment with Convergys, it was
not primarily developed during his employment with Convergys.
Finding of Fact 9.

19

Moreover, the benefit Convergys would receive from enforcing this agreement is outweighed by the detriment Wellman would experience if he were restrained from working for Sitel. As indicated, Wellman's position with Convergys did not place him in contact with customers and he was in no way responsible for sales or client relationships. Similarly, Wellman's position with Sitel does not involve solicitation of customers or employees. Thus, although Wellman is working for a competitor of Convergys, his position does not put him in direct competition with Convergys for clients or employees. On the other side of the coin, however, the issue is more significant than just whether Wellman can find another position working in human resources - surely he can. As Wellman explained at the hearing, however, his new position at Sitel essentially represents the pinnacle of his own career path. Tr. at 601; see also Tr. at 43 (describing Wellman's position with Sitel as a "one-of-a-kind" opportunity). Consequently, Wellman would be disproportionately disadvantaged by enforcing the agreement because he would be required to forego a significant and perhaps unique promotional opportunity. As to the second Raimonde factor, enforcing the agreement would impose an undue hardship on Wellman for the same reasons.

Therefore, considered together, these factors weigh in Defendants' favor.

**Whether the Forbidden Employment is Incidental to the Main Employment.** This factor apparently weighs in the employer's favor if the restrictive covenant does not apply to employment which is peripheral or tangential to the employee's employment with the employer. See Facility Servs. & Sys., Inc. v. Vaiden, No. 86904, 2006 WL 1572236, at *6 (Ohio Ct. App. June 8, 2006) (non-competition agreement unenforceable where, in part, it restricted employee from working in wide range of jobs tangential to his main employment). This factor weighs in Convergys's favor because the restricted employment is Wellman's main employment.

**Summary.** The factors that weigh in favor of finding that the agreement is reasonable are its time and geographical limitations and the fact that it does not preclude Wellman from accepting employment in areas or fields incidental to his main employment with Convergys. On balance, however, the remaining factors demonstrate that enforcing the agreement in this case would be unreasonable. Wellman did not have any customer or employee solicitation responsibilities in his position with Convergys and has none in his position with Sitel. Convergys is not likely to be prejudiced to the extent that Wellman has knowledge of Convergys's confidential information and trade secrets. Convergys is attempting to enforce the agreement to eliminate ordinary competition, not unfair competition. Enforcing the agreement in this case would not restrain Wellman from using

21

skills and experience he developed at Convergys, but rather would stifle his inherent skill and experience.  The benefit Convergys would gain from enforcing this agreement would be outweighed by the significant detriment to Wellman of having to forego a unique career opportunity.  Therefore, under Ohio law, the Court concludes that enforcing the non-compete agreement as written would be unreasonable.

Because the Court concludes that enforcing the agreement as written would be unreasonable, Convergys has failed to demonstrate a likelihood of success on the merits.

### B. <u>Irreparable Harm</u>

The plaintiff generally must always demonstrate the possibility of irreparable harm before preliminary injunctive relief will issue.  <u>Friendship Materials, Inc. v. Michigan Brick, Inc.</u>, 679 F.2d 100, 104 (6th Cir. 1982).  In this case, Convergys has not sufficiently demonstrated that it will suffer irreparable harm if the non-competition agreement is not enforced.  The Court recognizes that irreparable injury is the usual consequence of unfair competition.  <u>Circuit City Stores, Inc. v. CarMax, Inc.</u>, 165 F.3d 1047, 1056 (6th Cir. 1999); <u>Basicomputer Corp. v. Scott</u>, 973 F.2d 507, 512 (6th Cir. 1992)(loss of fair competition from breach of covenant not to compete is irreparable injury).  Here, however, as previously discussed, the record does not show that Wellman's position with Sitel would result in unfair competition.

Rather, Convergys is only confronted with ordinary competition, which is not irreparable. <u>Jacono v. Invacare Corp.</u>, No. 86605, 2006 WL 832451, at *8 (Ohio Ct. App. Mar. 30, 2006).

### C. <u>Harm to Others/The Public's Interest</u>

These factors have little or no bearing in this case. The Court sees no likelihood of harm to third parties whether or not an injunction issues. The Court presumes that the public has an interest in restraining unfair competition but otherwise would favor not restricting employment opportunities for employees. Therefore, in the context of this case, this factor probably favors Defendants.

### <u>Conclusion</u>

In conclusion, for the reasons stated, Plaintiffs have failed to demonstrate by clear and convincing evidence their entitlement to a preliminary injunction restraining Defendant Wellman from accepting employment with Defendant Sitel Corporation. Accordingly, Plaintiffs' motion for a preliminary injunction is not well-taken and is **DENIED.**

The Court will, however, continue in place the terms of the temporary restraining order (Doc. No. 7) for a period of two years following Defendant Wellman's termination of employment with Convergys as a reasonable alternative to protect Plaintiffs' legitimate business interests. Specifically:

1. Wellman shall not, either on behalf of himself, his employer Sitel Corporation, or any other person or entity, solicit or attempt to solicit any customers of Convergys, or any prospective Convergys' customers known to Wellman, or otherwise communicate in any manner with any customers or prospective customers of Convergys.

2. Wellman shall not, either on behalf of himself, his employer Sitel Corporation, or any other person or entity, sell or attempt to sell, any competitive products or services to a Convergys customer.

3. Wellman shall not, either on behalf of himself, his employer Sitel Corporation, or any other person or entity, solicit or attempt to solicit any employees of Convergys, or otherwise attempt to or actually induce, persuade, or entice any Convergys employee to terminate an employment relationship with Convergys or to accept employment with Sitel Corporation or any other entity.

4. Wellman shall maintain in absolute confidence, and not use or permit access to or disclose to any person or organization, including but not limited to Sitel Corporation, any trade secret of Convergys, which includes any information Wellman may possess concerning any confidential scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement,

24

or any business information or plans, financial information, or listing of names, addresses, or telephone numbers.

5. Sitel Corporation shall not encourage or cause Wellman to violate the restrictions set forth in this Order.

6. Wellman may continue his employment with Sitel Corporation, subject to the restrictions contained herein.

This order placing restrictions on Defendant Wellman's employment shall expire automatically on June 16, 2009.

**IT IS SO ORDERED**

Date November 30, 2007          s/Sandra S. Beckwith
                       Sandra S. Beckwith, Chief Judge
                        United States District Court

25